**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | | |
|---|---|---|---|
| DOUGLAS PFENNING, | | : | |
| | Plaintiff | : | Case No. 3:14-cv-471 |
| vs. | | : | District Judge Thomas M. Rose |
| LIBERTY LIFE ASSURANCE COMPANY, OF BOSTON | | : | |
| | | : | |
| | Defendant. | | |

---

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT, DOC. 14 AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 13.**

---

Plaintiff Douglas Pfenning brings this action under §502(a)(1)(B) of the Employee Retirement Income Security Act of 1972 (ERISA), 29 U.S.C. § 1132(a)(1)(B), against Defendant Liberty Life Assurance Company of Boston ("Liberty") to enforce his right to future long-term disability benefits, demanding that Liberty account for past benefits and pay future benefits. Both Mr. Pfenning and Liberty filed Motions for Judgment. Based upon the record before the Court, the Court denies Mr. Pfenning's Motion for Judgment on the Administrative Record, DOC. 14, and grants Liberty's Motion for Summary Judgment. Doc. 13.

**I. Background**

Mr. Pfenning was hired by Farmers Group, Inc. ("Farmers") in May 2002 as a Field Claims Representative and enrolled in the company's Employee Welfare Benefit Plan ("Plan"), administered by Liberty. (LL000035, LL000465). When he applied for benefits in 2013, Farmers employed Mr. Pfenning as a Catastrophic Adjustor-Mid-loss-Field. (LL000466)

1

According to Mr. Pfenning's description on the claims forms, his job requires him to handle mid-loss property claims due to fire, tornado, and hurricane; work 12-14 hours a day for 21 days straight; drive 3,000 miles a month; and climb up and down ladders, roofs and homes in order to inspect damages. (*Id.*) The job description provided by Farmers, titled Senior Claims Representative-Property, lists similar duties. Under "Essential Job Functions," duties include investigating and confirming coverage, determining liability, establishing damages, reporting the status and negotiating the settlement of claims. (LL000528) It confirms that those employees "assigned to the Catastrophe team will be required to travel away from their residence for a specified period of time, usually consisting of 23 days." (*Id.*) Physical demands are listed as bending, pulling sorting, carrying up to 50 lbs., pushing, climbing, reaching, standing, key entering, reading and writing English, walking, kneeling, and seeing. (LL000529) Finally, the description states that "[r]equired job duties are normally performed in a climate-controlled office environment," but the employee may be exposed to certain environments in the field:

> "Uncontrolled outside environmental conditions
>
> Excessive Noise Levels
>
> Chemicals
>
> Chemical/Biological Conditions
>
> Moving Mechanical Parts
>
> Areas considered to be dangerous
>
> Conditions, which could affect the respiratory system or skin such as: fumes, odors, dust, mists, gases, oils, smoke, soot, or poor ventilation."

(*Id.*)

**A. Disability Benefits Plan**

Under Section 2 of the plan entitled "Definitions:"

 **"Disability"** or **"Disabled"** means:

1.  For persons other than pilots, co-pilots, and crew of an aircraft:

    i.  If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform *all of the material and substantial duties of his occupation* on an Active Employment basis because of an Injury or Sickness; and

    ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(LL000005) (emphasis added)[1]

Under Section 4- Disability Income Benefits, the plan states that Liberty will pay disability benefits provided it receives proof (upon its request) of continued disability and regular attendance of a physician.  (LL000012)  The "Elimination Period" is defined as "a period of consecutive days of Disability for which no benefit is payable," which is 26 weeks.  (LL000003, LL000006)

**B. Short-Term Benefits Claim**

Mr. Pfenning began seeing a physician on April 22, 2013, when he visited Dr. Matthew O'Connell for chronic fatigue.  (LL000235)  Dr. O'Connell diagnosed him with fatigue, essential hypertension, and depression.  (*Id.*)  Dr. O'Connell also noted that there may be some neuropathy as a result of excessive alcohol intake.[2]  (*Id.*)  Mr. Pfenning returned to Dr.

---

[1] Because Mr. Pfenning was never awarded the first 24 months of benefits, only definition 1(i) applies in this case.

[2] Neuropathy is a disease of one or more peripheral nerves that typically causes numbness or weakness.

O'Connell's office August 29, 2013 complaining of daily foot pain, including numbness and tingling in both his legs below the knees, joint swelling, and fatigue. (LL000230-31)

Dr. O'Connell referred Mr. Pfenning to a spinal specialist, Dr. David Johnson, who conducted an electromyography (EMG) on September 9, 2013 and found evidence of injury possibly tied to a prior fall or to peripheral neuropathy. (LL000335) Dr. O'Connell ordered an MRI of Mr. Pfenning's spine during his visit on September 11, 2013. (LL000229).

On September 17, 2013 Mr. Pfenning filed a request for leave from his job for idiopathic neuropathy, with a start date of September 18 and an end date of November 2, 2013[3]. (LL000051, Claim Note 1) While his claim was being processed, Mr. Pfenning continued to seek medical attention for his condition. He returned to Dr. Johnson on September 26, 2013 complaining of significant swelling in his ankles and lower legs, as well as the constant burning in his feet. (LL000333-34) He followed up with Dr. O'Connell on October 7, 2013 for aggravation of the burning and pain in his legs. (LL000223)

During this time, Liberty requested Mr. Pfenning's medical files from Dr. O'Connell, along with an Attending Physician Statement. (LL0000570, LL000580, LL000597) Dr. O'Connell's statement characterized Mr. Pfenning's prognosis as "poor," classified his physical impairment as a "[s]evere limitation of functional capacity; incapable of minimum activity," and noted that he had to change positions frequently. (LL000562) An MRI of Mr. Pfenning's brain raised the possibility of a demyelinating disease, but was not conclusive.[4] (LL000399)

Liberty approved Mr. Pfenning's claim for Short Term Disability ("STD") benefits on October 21, 2013 for the time period of September 18 to November 4, 2013. (LL000556)

---

[3] Idiopathic neuropathy is neuropathy where a cause cannot be determined.
[4] A demyelinating disease is a condition that results in damage to the protective covering surrounding nerve fibers in the brain and spinal cord, causing nerve impulses to slow and resulting in neurological problems.

Liberty extended STD benefits four more times, with a final termination of March 18, 2014. (LL000045-48, Claim Notes 16, 20, 26, and 35)

Mr. Pfenning continued to consult with physicians during the time the STD benefits were paid. He visited Dr. Joel Vandersluis on October 29, 2013, who concluded that the abnormal MRI was likely related to alcohol intake and hypertension, but a more serious demyelinating disease could not be ruled out at that point. (LL000254) He followed up with Dr. O'Connell the next day, October 30, to follow up on his symptoms. (LL000218-21)

Mr. Pfenning began visiting a neurologist, Dr. Kenneth Pugar, on December 6, 2013. (LL000197-98) He again returned to Dr. O'Connell on January 7, 2014 for an increase in pain, and again on January 10, 2014 after a visit to the ER for a nose bleed and dizziness. (LL000214-17, LL000210-13) He returned to Dr. Pugar on January 31 and March 10, 2014 for further evaluation. (LL000187, LL000248-49) He followed up with Dr. O'Connell on February 4, 2014 for dizziness and an issue with his balance, and again on February 19 for continued lightheadedness. (LL000205-09, LL000200-04)

**B. Long-Term Benefits Claim Review**

While paying out STD benefits, Liberty referred Mr. Pfenning's file to its Long-Term Disability ("LTD") department for review and possible pay out of long-term benefits. (LL000045, Claim Note 36) Liberty hired ICS Merrill ("ICS") on January 24, 2014 to conduct surveillance on Mr. Pfenning. (LL000473) Between January 25 and 30, ICS observed Mr. Pfenning conducting daily errands, showing that he lifted groceries, wore no visible braces or used any other orthopedic devices. (LL000476)

Liberty also ordered an Occupational Analysis and Vocational Review ("Occupational Review"). The Case Manager, Ms. Amanda Voce, utilized both Mr. Pfenning's job description

and that supplied by Farmers to determine the occupational title, which contains four Dictionary of Occupational Titles ("DOT") descriptions and two Standard Occupational Classification/Occupational Information Network ("SOC/O*NET") descriptions that reflect similar tasks. (LL000424-25)  Tasks in the descriptions are "[i]nvestigate, analyze, and determine the extent of insurance company's liability concerning . . . loss or damages, and attempt to effect settlement with claimants." (LL000425)  Sample job titles under these definitions include Claims Representative, Claims Adjuster, Insurance Adjuster, and General Adjuster. (*Id.*)

Ms. Voce concluded that the physical demands of Mr. Pfenning's occupation of Claims Examiner-Adjuster-Investigator were sedentary and light in physical demand. (LL000426) According to the Department of Labor, sedentary work is defined as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to move objects," "frequent to constant sitting," "frequent handling, fingering and reaching," and "occasional standing and walking." (LL000425-26)  Light work is defined as "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects," "frequent sitting, standing, reaching, handling and fingering," and "occasional walking and bending/stooping." (LL000426)

Finally, Liberty hired a neurologist, Dr. Frisso Potts, to conduct an in-house review of Mr. Pfenning's medical files.  Dr. Potts contacted Drs. O'Connell, Pugar, and Johnson, as well as attending physical therapists, requesting more information regarding Mr. Pfenning's neuropathy, plans for pain management and return to work, the role of alcohol abuse in the current clinical status. (LL000347-50, LL000356-61, LL000387, LL000389)  He inquired into their opinions regarding Mr. Pfenning's ability to function at work. (LL000349)  The only attending physician

that responded was the physical therapist, who confirmed Dr. Potts' eventually proposed restrictions and limitations on work capacity. (LL000370) Dr. Potts also reviewed the surveillance gathered by ICS. (LL000367)

Dr. Potts established that while Mr. Pfenning's diagnosis of generalized peripheral polyneuropathy resulted in difficulty in balance on certain surfaces and circumstances as well as pain, neither condition rose to the level of impairment as evidenced by Mr. Pfenning's surveillance.[5] (LL000366) He found no restrictions and limitations on sitting, driving, light or force grasping, and "fingering/typing or reaching at or below shoulder level," but listed restrictions as "[s]tanding and walking on an occasional basis in an 8 hour workday," "[n]o walking, on wet or uneven ground, or in low light environment," "[n]o climbing ladders," "[s]quatting, bending or kneeling on an occasional basis in an 8 hour workday" (but avoiding those activities in a low light environment or uneven/wet surfaces), "avoid activities in unprotected heights or near unprotected large bodies of water," "pushing/pulling up to 10 pounds while standing/walking and up to 20 pounds while sitting, on an occasional basis in an 8 hour workday," "no reaching overhead, as this may cause loss of balance," and "lifting up to 10 pounds on an occasional basis in an 8 hour work day while standing/walking." (LL000367) Finally, Dr. Potts concluded that Mr. Pfenning sustained "full time work capacity." (*Id.*)

Ultimately, Liberty denied Mr. Pfenning's LTD benefits on March 14, 2014 based on the Occupational Analysis, the surveillance, and Dr. Potts' review. (LL000342-46) Liberty determined that Mr. Pfenning "retain[ed] the capacity to perform [his] occupation," and thus did not meet the Plan's definition of disability. (LL000345) It advised Mr. Pfenning that he could appeal the denial. (*Id.*)

---

[5] Generalized peripheral polyneuropathy is damage to the peripheral nerves, often causing weakness, numbness and pain in the hands and feet.

## C. Appeal

Upon denial of benefits, Mr. Pfenning informed Liberty of his intent to appeal. (LL000039, Claim Note 33)  He submitted a formal appeal August 12, 2014, along with a vocational review, a Functional Capacity Evaluation ("FCE"), and a letter from Dr. Pugar. (LL000139)

First, Mr. Pfenning submitted a vocational review by Mr. Mark Pinti, a vocational rehabilitation specialist.  After meeting with Mr. Pfenning and examining several records, including the job description from Farmers, Liberty's Occupational Analysis, and the FCE, Mr. Pinti concluded that Mr. Pfenning was "no longer capable of performing the duties and functions of the job of a Catastrophe Claim Adjuster," and that he "would be incapable of performing a Claim Adjuster job, and [was] most likely incapable of performing even sedentary work activity." (LL000154)

Next, Mr. Pfenning also submitted an FCE, conducted on June 13, 2014 by Dr. Rick Wickstrom.  (LL000161-77)  Dr. Wickstrom concluded, based on Mr. Pfenning's level of function at that time and his work description, Mr. Pfenning was only able to lift or carry one to five pounds, push up to 30 pounds.  (LL000177)  His ambulation agility and stamina, climbing, keyboard speed, finger dexterity, and manual dexterity were all classified as very low.  (*Id.*) Standing, operating foot controls, reaching above the shoulder, and forward bending/stooping were all classified as occasional, while sitting was classified as frequent.  (*Id.*)  Finally, Dr. Wickstrom recommended that Mr. Pfenning be "restricted from all job duties that require climbing of ladders, walking on uneven grounds, prolonged sitting in a constrained posture to drive between locations and carrying of 50 lbs." (*Id.*)

8

Dr. Wickstrom made note of his concern regarding an inconsistency in Mr. Pfenning's evaluation:

> Mr. Pfenning was cooperative; however he reports multiple areas of subjective complaints [and] demonstrated multiple inconsistencies that made this examiner question his reliability and validity on many functional tests that were administered during this exam. His performance was substantially limited by poor agility, yet he has not used an assistive device recently.

(*Id.*)

Finally, Mr. Pfenning submitted a letter from Dr. Pugar that mentioned the possibility of a diagnosis of multiple sclerosis ("MS"), but warned that further tests were required due to the difficulty in establishing the presence of such a disease. (LL000194-96)

Upon notice of appeal, Liberty submitted the Occupational Analysis previously completed by Ms. Voce to its employee, Michelle Reddinger, a vocational case manager, for a review. (LL000091-96) This review considered all of the information that was part of the first Occupational Analysis, and included the vocational review conducted by Mr. Pinti. (LL000092) In her review, Ms. Reddinger pointed out that, while Mr. Pinti found that the job of Catastrophe Claim Adjuster could not be performed at a sedentary or light physical demand level, Mr. Pfenning "is insured by his [Plan] for his own **occupation** rather than his own **job**." (LL000094) (emphasis original) She then clarified the definitions of job and occupation according to The Quick Desk Reference for Forensic Rehabilitation Consultants:

> A **job** is a group of positions within an establishment which are identical with respect to their major or significant tasks and sufficiently alike to justify their being covered by a single analysis. There may be one or many persons employed in the same job.

> An **occupation** is a group of jobs, found at more than one establishment, in which a common set of tasks are performed or are related in terms of similar objectives, methodologies, materials, products, worker actions, or worker characteristics.

(*Id.*)  Ms. Reddinger affirmed the original opinion that Mr. Pfenning's job of Catastrophe Claims Adjuster was one of the jobs within the global occupation of Claim Examiner/Adjuster/Investigator, with two manners of performance on the national economy: "sedentary (inside) and light (outside)."  (LL000095)

Liberty hired Dr. David Lang, a neurologist, and Dr. Sarah White to conduct a peer review of Mr. Pfenning's medical records, the Functional Capacity Evaluation, the Occupational Analysis, the vocational review, Dr. Potts' in-house review, the surveillance video and report, all job descriptions from Mr. Pfenning and Farmers, any attorney correspondence, and internal case notes.  (LL000107-08)  They attempted to contact both attending physicians; Dr. Lang never received a return phone call from Dr. Pugar, and Dr. O'Connell refused to discuss Mr. Pfenning's functionality from a physical perspective with Dr. White.  (LL000108, LL000109)

Dr. Lang concluded that, based on inconsistencies presented in the medical evidence and the lack of a definitive diagnosis, Mr. Pfenning presented no impairment or restrictions or limitations.  (LL000115)  Dr. Lang noticed several points of inconsistency. First, Mr. Pfenning reported memory loss, but his physicians documented normal mental status examinations.  (*Id.*)  Mr. Pfenning admitted to drinking alcohol on a daily basis to one physician but reported to other physicians that he had stopped drinking for several years.  (*Id.*)  Dr. Lang also points out Dr. Wickstrom's note regarding an inconsistency during the Functional Capacity Evaluation.  (*Id.*)  Finally, Dr. Lang opines that the surveillance showing Mr. Pfenning's ability to walk, stand, and drive was contrary to his reports in the activity questionnaire that he needed assistance walking, suffered multiple falls over time, and had the ability to sit and stand for only a very limited period of time.  (LL000116)  Due to these inconsistencies, Dr. Lang concluded that Mr. Pfenning was able to "perform even sedentary work on a sustained full time basis."  (LL000117)

Dr. White's review echoed the same concerns expressed by Dr. Lang. She noted that, due to the uncertainty "whether or not Mr. Pfenning displayed full effort throughout testing" that resulted in inconsistencies, the Functional Capacity Evaluation results were invalid. (LL000119) Inconsistent strength and weakness as listed in the evaluation are evidence of this lack of full effort. (LL000118) Dr. White opines that Mr. Pfenning is able to perform sedentary work on a full time basis because nothing in the medical records documented a significant loss of strength or muscle atrophy, there was no indication of the need for an assistive device, and there was nothing in the medical records to support "an inability to lift, carry, push or pull up to 10 pounds occasionally." (LL000120)

On November 12, 2014, Mr. Pfenning submitted a letter from Dr. Pugar asserting that he "more than likely has a diagnosis of Multiple Sclerosis." (LL000088) Liberty submitted the letter to Dr. Lang for consideration in the peer review. Dr. Lang did not change his conclusions. (LL000071) He reasoned that the additional documentation did not provide any information to support any functional impairment, limitation or restriction nor did it support any functional impairment; that, while MS is a neurological disease, it did not necessarily imply functional impairment at that time; and that the additional information did not clarify the previously documented inconsistencies. (*Id.*)

Liberty determined that Mr. Pfenning did not meet the Plan's definition of disability from his own occupation, and issued its second and final denial on November 24, 2014. (LL000061-68) He filed the current action on January 16, 2015. (LL000037, Claim Note 54)

## II. Standard of Review

A denial of benefits challenged under 29 U.S.C. §1132(a)(1)(B) is reviewed *de novo*; however, if the benefit plan grants to itself discretionary authority either to determine eligibility

for benefits or to construe the terms of the plan, the denial is reviewed under an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Smith v. Bayer Corp. Long Term Disability Plan,* 275 Fed. App'x. 495, 504 (6th Cir. 2008). There is no specific language that needs to be used to create discretionary authority, as long as the grant of discretion is clear. *Johnson v. Eaton Corp.,* 970 F.2d 1569 n.2 (6th Cir. 1992); *Wulf v. Quantum Chemical,* 26 F.3d 1368, 1373 (6th Cir. 1994). The plan administrator holds the burden of proving such discretionary authority. *Brooking v. Hartford,* 167 Fed. App'x. 544, 547 (6th Cir. 2006).

Mr. Pfenning argues that *de novo* review is proper in the instant case because California law prohibits discretionary language in policies such as this. The Group Disability Income Policy states under Section 7-General Provisions, "Interpretation of the Policy", that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (LL000025). Under the heading "Conformity with State Statutes" in the General Provisions, the policy states "[a]ny provision of this policy which, on its Effective Date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such state." (LL000028) The first page of the policy declares that the governing jurisdiction is California and that the policy is subject to the laws of that state. (LL000001). California Insurance Code states:

> If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

Cal. Ins. Code § 10110.6(a)(2015).

**A. Preemption**

Liberty argues that the California statute is preempted by 29 U.S.C. § 1144(a) because the remedy sought by Mr. Pfenning is completely plan related.  (Def.'s Rep. to Mot. for J. 2).  Liberty relies on *Thurman v. Pfizer Inc.,* 484 F.3d 855 (6th Cir. 2007), applying the principle from the case that claims based on expectation damages are preempted because they are primarily plan related.  (*Id.)*

In *Thurman*, the plaintiff filed suit in state court for rescission of the contract and recovery of damages after the defendant made misrepresentations about the plaintiff's monthly pension that induced him to leave his prior job.  *Thurman* at 857.  The Sixth Circuit affirmed the district court's dismissal of the state law claim for expectation damages because of preemption, but reversed dismissal as to the claims for rescission and reliance damages because the claims were not related to the plan.  *Id.*

The instant case is much different from *Thurman* and warrants a different argument.  First, there are two different issues being considered for preemption.  In *Thurman*, the plaintiff filed state law claims, two of which were found not to be preempted, while here Mr. Pfenning filed a claim that falls squarely under the federal purview under ERISA.  29 U.S.C. § 1132(a)(1)(B).  Second, the plan at issue under *Thurman* was a pension plan, where in the instant case the plan at issue is a disability plan.  Thus, the reason for preemption in *Thurman* is not applicable to this case.

Nonetheless, the California statute may still be preempted under ERISA.  Any state law regulating an employee benefit plan is preempted by 29 U.S.C. § 1144(a); however, a plan that "regulates insurance, banking, or securities" becomes exempt under the savings clause.  29 U.S.C. § 1144(b)(2)(A); *Johnson v. Connecticut Gen. Life Ins. Co.,* 324 Fed. App'x. 459, 462

13

(6th Cir. 2009). To be deemed a law that regulates insurance, California Insurance Code § 10110.6 must satisfy the *Miller* test set forth by the Supreme Court: "(1) 'the state law must be specifically directed towards entities engaged in insurance' and (2) 'the state law must substantially affect the risk pooling arrangement between insurer and the insured.'" *Johnson* at 463 (quoting *Kentucky Assoc. of Health Plans, Inc. v. Miller,* 538 U.S. 329, 342 (2003)). Because California Insurance Code § 10110.6 meets this test, it falls under the savings clause and is not preempted under §1144(a).

**1. Specifically Directed Towards an Entity Engaged in Insurance**

First, California Insurance Code § 10110.6 is not preempted because it is specifically directed towards an entity engaged in insurance. Laws that attempt to regulate insurers with respect to their practices are considered to be specifically directed towards an entity engaged in insurance. *Miller* at 334. This includes statutes that impose conditions on the right to engage in the business of insurance. *Am. Council of Life Insurers v. Ross,* 558 F.3d, 600, 605 (6th Cir. 2009) In *Ross*, the Sixth Circuit held that a Michigan law prohibiting insurers who provided insurance in the state from using discretionary clauses on their forms was an imposition on an insurer's ability to conduct its business. *Id.* Here, similar to the Michigan case, the California statute imposes conditions on Liberty's ability to conduct business. Thus, the statute is specifically directed towards an entity engaged in insurance, the law is specifically directed towards an entity engaged in insurance because it regulates the authority of an insurer with respect to its practices by dictating the use of discretionary clauses.

**2. Substantially Affects the Risk Pooling Arrangement**

Second, California Insurance Code § 10110.6 is not preempted because it substantially affects the risk pooling arrangement. Risk pooling involves spreading losses over all the risks so

14

as to enable the insurer to accept such risk, *Union Labor Life v. Pireno,* 458 U.S. 119, 127-28 (1982), and is affected when the law alters the scope of permissible bargains between the insurer and insureds. *Kindel v. Cont'l Cas. Co.,* No. 1:02-CV-879, 2005 U.S. Dist. LEXIS 9878, at *7 (S.D. Ohio May 25, 2005). *Accord Ross* at 607; *Miller,* 538 U.S. at 338.

Any attempt to change the enforceable terms of insurance contracts is considered an alteration of the bargain. *Ross* at 607. Again, the Sixth Circuit held in Ross that the prohibition on discretionary clauses in forms substantially affected the risk pooling arrangement as an alteration of the bargain because it directly controlled the terms of insurance contracts and dictated to insurers the conditions under which they must pay for the risk. *Id.* at 607. *Accord Standard Ins. Co. v. Morrison,* 584 F.3d 837, 845 (9th Cir. 2009) (holding that the practice of disapproving discretionary clauses substantially affected the risk pooling because it dictated to the insurance company the conditions under which it must pay for the risk it has assumed); *Fontaine v. Metro Life Ins. Co.,* No. 14-1984 2015 U.S. App. LEXIS 15818, at *7 (7th Cir. Sept. 4, 2015) (holding that state law prohibiting discretionary clauses in disability insurance policies altered the scope of permissible bargains between the insurer and insured, thus affecting risk pooling).

Just as the Michigan statute altered the bargain between the insurer and the insureds in the state, the California statute in this case forbids insurers to use what is a normally enforceable term in an insurance policy or contract, thus affecting the risk pooling arrangement. Because the California Insurance Code §10110.6 is specifically directed at entities engaged in insurance and substantially effects the risk pooling arrangement, it falls under the savings clause and is not preempted under 29 U.S.C. § 1144(a).

**B. Insurance Code Inapplicable in this State**

Liberty further argues that this discretionary clause is valid because the California law only applies to California residents.  The Court agrees.  The code explicitly states that the policy with the discretionary clause is void if it "provides or funds life insurance or disability insurance coverage for *any California resident*."  *Id.* (emphasis added).  Mr. Pfenning is a resident not of California, but of Ohio.

Mr. Pfenning claims that issue preclusion binds Liberty to previous acknowledgments that the *de novo* review mandated by California law applies to decisions implementing the plan.  *See e.g.* Pl. Rep. to Mot. for Summ. J. Ex. B at 9 ("[D]iscretionary clause was no longer operative as of January 1, 2012. . ."); *Id.,* Ex. C at 2 ("The parties agree that the Plan is governed by ERISA and the appropriate standard of review is de novo.")  However, all cited pleadings were filed in federal court in California courts involving California residents.  For this reason, Liberty is not precluded from arguing that the discretionary clause in the policy is valid in this case.

**C. Arbitrary and Capricious Standard of Review**

The appropriate standard of review in this case is the arbitrary and capricious standard because, while recitation of the word discretion is not necessary to show that authority, the plan here clearly states that Liberty holds discretion to construe the terms of the policy and determine eligibility for benefits (LL000025).  Under the arbitrary and capricious standard, the least demanding form of judicial review of administrative actions, a court must decide if the administrative decision was "rational in light of the plan's provisions." *McDonald v. Western-Southern Live Ins. Co.,* 347 F.3d 161, 168 (6th Cir. 2003).  In other words, the outcome is not considered arbitrary and capricious where it is possible to offer a reasoned explanation based on the evidence for a particular outcome.  *Id.*; *Smith,* 275 Fed. App'x. at 504.  Nor is a denial

arbitrary and capricious if it is based "on a reasonable interpretation of the plan." *Kmatz v. Metro. Life Ins. Co.,* 232 Fed. App'x. 451, 455 (6th Cir. 2007) (quoting *Shelby Co. Health Care Corp. v. So. Council of Indus. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 933 (6th Cir. 2000)).

Where a plan gives discretion to the administrator, a possible conflict of interest may exist that must be weighed as a ""factor in determining whether there is an abuse of discretion.""" *Metro. Life Ins. Co. v. Glenn,* 128 S.C. 2343 (2008) (quoting *Firestone Tire & Rubber co. v. Bruch,* 489 U.S. 101,115 (1989)).   This factor weighs heavily where "'circumstances suggest a higher likelihood that it affected the benefits decision'" and less so "'where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Johnson,* 324 Fed. App'x. at 465 (quoting *Glenn,* at 2346).   Here, Liberty serves as both the payor and the plan administrator, which causes the Court to afford it less deference due to a possible conflict of interest.

**III. Analysis**

In reviewing the denial, this Court is confined to the record that was before Liberty for consideration.  *Wilkins v. Baptist Healthcare Sys.,* 150 F.3d 609, 615 (6th Cir. 1998).   Mr. Pfenning argues in his Motion for Judgment on the Administrative Record that Liberty acted in an arbitrary and capricious manner when Liberty (1) determined his occupation was sedentary, and (2) ignored the FCE and his diagnosis in its decision.   Conversely, Liberty argues in its Motion for Summary Judgment that Mr. Pfenning failed to demonstrate that he was disabled according to the Plan.

**A. Liberty's Use of DOT to Determine Own Occupation**

Mr. Pfenning argues that Liberty acted arbitrarily when it used the Dictionary of Occupational Titles ("DOT") to determine "own occupation" instead of on the actual job descriptions provided by himself and Farmers.  (Pl. Mot. for J. 25, PAGEID #: 713).  *See Calhoun v. Group Long-term Disability Plan for Employees of NK Parts Industries, Inc.,* No. 3:10-cv-271, at 15-16, PAGEID #: 416-17 (S.D. Ohio July 18, 2011) (Rose, J.) (reversal of denial of benefits because the plan administrator determined the specific job instead of the occupation, failed to establish the essential duties of that occupation, and failed to consider the employee's ability to perform those essential duties); *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 18 (6th Cir. 2006) (holding that plan administrator did not make a reasoned judgment when it failed to apply relevant medical evidence to the occupational standard); *Geiger v. Pfizer,* 918 F. Supp. 2d 697, 704-05 (S.D. Ohio 2013) (Smith, J.) (remand to plan administrator for consideration of plaintiff's occupational requirements in determination of benefits).

Plaintiff also draws attention to decisions on this issue against Liberty by other courts. For example, in *Kavanay v. Liberty Life Assur. Co.,* Liberty denied LTD benefits to an insured employee after the vocational analysis determined the DOT category of a sedentary occupation, despite the fact that the employee indicated his job duties included tasks requiring physical demand, such as frequent standing and walking.  914 F. Supp. 2d 832, 834-35 (S.D. Miss. 2012). The court held that Liberty's denial was arbitrary and capricious because it disregarded the nature of the position and the specific tasks required to perform the duties.  *Id.* at 836.

However, the Sixth Circuit has also established that "occupation" is general and flexible enough to justify determining duties in light of DOT "rather than examining in detail the specific duties the employee performed." *Osborne v. Hartford Life & Accident Ins. Co.,* 465 F.3d 296, 299 (6th Cir. 2006) ("'Occupation' is a more general term that seemingly refers to categories of

18

work than narrower employment terms like 'position,' 'job,' or 'work,' which are more related to a particular employee's individual duties.").  Likewise, the general DOT descriptions used to define material duties must involve comparable duties as the individual job, but not necessarily every duty of the occupation.  *Id.*

The Plan does not define "own occupation" or "occupation" in general.  Liberty argues that use of the DOT  to define "own occupation" is a valid practice, as it means the group of jobs to which Mr. Pfenning's job belongs, but not the job itself.  (Def. Rep. Mot. for J. 11, PAGEID #: 731).  A range of jobs can fit into one occupation, some with sedentary capacity and others with light work capacity.  (*Id.*).

Liberty's practice is not arbitrary and capricious because it is part of a reasoned process. Both Ms. Voce and Ms. Reddinger examined the job descriptions provided by Farmers and Mr. Pfenning in their determination of his occupation.  They compared the duties listed in those descriptions with the tasks encompassed by the DOT and SOC/O*NET descriptions, including duties such as investigation insurance claims and attempting to effect settlements with claimants, as well as requiring enough functionality to walk, stand, sit and push and pull certain weight.

While Mr. Pfenning's job contains additional field duties, not every single duty needs to be reflected as long as his other comparable duties are considered.  Because the use of the DOT was part of a reasoned process, Liberty did not act in an arbitrary and capricious manner.

**B. Liberty's Rejection of the FCE and Diagnosis**

Mr. Pfenning argues that Liberty's rejection of the FCE was an improper disposition of the evidence presented.  (Pl. Mot. for J. 28, PAGEID #:716).  Additionally, Mr. Pfenning argues that Liberty failed to conduct an Independent Medical Examination to confirm diagnosis, opting instead for peer review.  (*Id.*)

An FCE is considered objective evidence "gauging the extent one can complete work-related tasks," *Caesar v. Harford Life & Accident Ins. Co.,* 464 Fed. App'x. 431, 435 (6th Cir. 2012), and rejection thereof without explanation is considered arbitrary and capricious. *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 296 (6th Cir. 2005); *Brooking,* 167 F. App'x. at 549.  For example, in *Bowers v. Hartford Life & Accident Ins. Co.*, the court held that a denial of benefits was arbitrary and capricious where the peer reviewer disagreed with the FCE with no explanation and never consulted with the plaintiff's treating physicians.  No. 2:09-CV-290, 2010 U.S. Dist. LEXIS 48157 (S.D. Ohio May 17, 2010).

Additionally, there is no requirement to conduct additional medical tests over a file review provided the conclusions are "square with verifiable objective results" of medical evidence and those familiar with the plaintiff's medical history.  *Calvert,* at 296-97.  Likewise, giving greater weight to the opinion of a non-treating physician for no apparent reason is considered arbitrary and capricious.  *Cook v. Prudential Ins. Co of Am.,* 494 Fed. App'x. 599*,* 608 (6th Cir. 2012).  *See also Niswonger v. PNC Bank Corp. & Affiliates Long Term Disability Plan,* 612 Fed. App'x. 317, 323 (6th Cir. 2015) (White, J.) (holding that Liberty's denial of benefits was arbitrary and capricious because of its disregard of reliable evidence, such as ignoring objective medical tests and opinions of treating physicians for no reason, failing to rebut medical evidence, and not requesting an independent examination).

Liberty's rejection of the FCE and diagnosis was not arbitrary and capricious because, first, both were considered in the peer review, and second, Liberty offered an explanation for its subsequent disregard of both.  Both the FCE and Mr. Pfenning's diagnosis are discussed in depth by Dr. Lang and Dr. White in the peer review.  They call attention to the fact that the FCE contains inconsistent results.  Dr. Wickstrom, who examined Mr. Pfenning during the FCE, was

the first to question Mr. Pfenning's reliability and validity on the functional tests.  This inconsistency of results is what led the peer reviewers to consider the FCE invalid.

Additionally, Dr. Lang explains that, while Mr. Pfenning may have a diagnosis of MS, that diagnosis is not definitive.  The medical records also lack an objective showing of impairment.  Any additional information provided by Dr. Pugar still failed to provide objective evidence of impairment.

Furthermore, Liberty did not act in an arbitrary or capricious manner because it attempted to consult with Mr. Pfenning's attending physicians.  Both peer reviewers attempted to contact Dr. Pugar and Dr. O'Connell.  Dr. O'Connell refused to communicate with the peer reviewers regarding Mr. Pfenning's functionality.  After several attempts to contact each other by both parties, Dr. Pugar responded via letter.  Dr. Lang's subsequent addendum to his recommendation indicates that this contact still did not yield the necessary objective medical evidence of impairment.

The lack of an independent medical examination is not dispositive here.  Because it offered explanations for its dismissal of the FCE and Mr. Pfenning's diagnosis and consulted with Mr. Pfenning's physicians, Liberty did not act in an arbitrary or capricious manner.

## IV. Conclusion

Liberty showed a reasoned process in its use of the DOT to determine "own occupation," offered an explanation regarding the dismissal of the FCE and the diagnosis in the peer review, and consulted with Mr. Pfenning's attending physicians; therefore, it did not act in an arbitrary and capricious manner when it denied Mr. Pfenning's LTD benefits.  Therefore, Liberty's Motion of Summary Judgment, doc 13, is **GRANTED** and Mr. Pfenning's Motion for Judgment,

doc. 14, is **DENIED**. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

      **DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, December 23, 2015.

                         s/Thomas M. Rose

                        _____

                        Thomas M. Rose, United States District Judge