UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ANGIE SIKKEMA,<br>Plaintiff, | )<br>)<br>) No. 1:15-cv-494 |
| -v- | )<br>) HONORABLE PAUL L. MALONEY |
| LIBERTY LIFE ASSURANCE COMPANY<br>OF BOSTON,<br>Defendant. | )<br>)<br>)<br>) |

## OPINION

This case involves a claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Before this court are cross-motions for judgment on the administrative record (ECF Nos. 12 and 13), filed pursuant to *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

I. BACKGROUND

In 1999, at thirteen-years-old, Plaintiff Angie Sikkema was diagnosed with scoliosis, which resulted in surgery in 1999 with the placement of two Harrington rods in her back from levels T5 through L1. (ECF No. 10-3 at PageID.281.)

Her health conditions did not impede her ability to work early on. Ms. Sikkema was hired by Farmers Group, Inc. (Farmers) on October 3, 2011, and began working full-time as a "Customer Service Associate" at a call center. (ECF No. 10-7 at PageID.681.)

In the middle of 2013, Ms. Sikkema began to experience pain in her upper and lower back as well as bilateral hips. Due to the increasing severity of her pain, in January 2014, she was referred to Quratul Ain Aziz, M.D., of Mercy Health Physician Partners, board-certified

1

in internal medicine. (ECF No. 10-3 at PageID.281.) Ms. Sikkema was also referred for a course of intense physical therapy. (*Id.*) Dr. Aziz assumed primary care of Ms. Sikkema and immediately placed her on high-dose narcotics to attempt to control her intractable pain, and disabled her from any full-time employment, as attested by the Physician's Statement of Disability. (ECF No. 10-2 at PageID.117.)

    Dr. Aziz characterized Ms. Sikkema's diagnoses as follows:

Scollosis post open fixation with placement of two Harrington rods;
Thoracogenic scollosis;
Lumbosacral spondylosis as L3-L4 and L4-L5 with myelopathy;
Osteoarthritis
Sacriolitis
Facet arthritis of lumbar region;
Thoracic myositis;
Costovertebral degenerative changes at T5, T6, and T10;
Lumbar facet arthorapathy at L3-L4 bilaterally;
Sacroillac joint dysfunction;
Lumbar degenerative disc disease;
Fibromyalgia
Ankylosing spondylosis;
Chronic pain syndrome;
Lumbar post laminectomy pain syndrome;
Trochanteric bursitis;
Cephalgia;
Rheumatoid factor serologic test positive.

(*Id.*)

    Dr. Aziz's statement further advised that Ms. Sikkema "experiences chronic and severe pain in her upper back, lower back, and hips with a radiation and gluteal areas. She is unable to sit and/or stand for prolonged periods of time and **is presently prescribed the highest dose of morphine for a non-malignant medical condition.**" (*Id.* (emphasis added).)

2

And the record includes more than simply subjective evidence of pain. Numerous, positive electrodiagnostic test results—performed on Ms. Sikkema during the spring and summer of 2014 at two hospitals—supported Ms. Sikkema's reported pain experience. These tests included x-rays, MRI, CT, and bone scans, and a nuclear medicine study; the tests documented positive findings including, most notably, that "the hook at the upper end of the right Harrington rod appear[ed] to have become dislodged from [Ms. Sikkema's] spine." (ECF No. 10-4 at PageID.366.) Other findings included, but were not limited to: "mild degenerative changes of the sacroiliac joints" and of "the facet joints at the lower three levels" (*id.* at PageID.383); "narrowing of the left hip joint space" (*id.* at PageID.393); "minimal bulging of the intervertebral disc" (*id.* at PageID.395); "increased uptake at disc levels T4-T5, T7-T8, T8-T9, and T9-T10" (*id.* at PageID.401); "[m]ild increased radiotracer activity" at T5, T6, T10, and L3-L4, bilaterally (*id.*); and "intense . . . bilateral sacroiliac joint activity." (*Id.*) Of course, further positive observations could have been observed absent the amount of obstructive metal pieces remaining in and around Ms. Sikkema's spine. (*E.g., id.* at PageID.403.) Liberty and its reviewers had all of these findings available for review.

On March 6, 2014, Liberty wrote Ms. Sikkema to advise that her claim for Short-Term Disability Benefits "ha[d] been approved through 3/17/2014 based upon the medically supported disability date of 2/6/2014." (ECF No. 10-8 at PageID.846.)

On June 12, 2014, Liberty wrote Ms. Sikkema to advise: "Farmers' Group Inc.'s Short Term Disability Plan provides benefits for a maximum period of 26 weeks; currently your claim is approved through July 30, 2014. Should your disability continue the maximum period those benefits will end on August 6, 2014." (ECF No. 10-7 at PageID.695.) Liberty

advised it would evaluate Ms. Sikkema's entitlement to continued benefits under Liberty's long-term disability policy. (*Id.* at PageID.695-97.)

On September 9, 2014, Liberty's wrote Ms. Sikkema to advise that Liberty had determined that long-term benefits were "not payable." (ECF No. 10-3 at PageID.287.)

Liberty advised that after receiving medical records from Ms. Sikkema's treating providers, including Drs. Aziz, Bradley, and Gostine, Advent Rehabilitation, and Orthopaedic Associates of Michigan, Liberty had proceeded to solicit two "medical reviews" of Ms. Sikkema's claim, both from a nationwide commercial provider of "peer review" reports for insurance companies from physicians, MES Solutions. The first report was a "Psychiatry Review" of Ms. Sikkema's diagnosed depression by a doctor from New York, and the second was a "Pain Management Review" performed by Todd Graham, M.D., of South Bend, Indiana, a physiatrist, board-certified in pain medicine.

Liberty's relevant denial depended only upon the opinion of Dr. Graham, whom, while conceding that the medical records forwarded to him by Liberty "supported" all of the diagnoses reached by Ms. Sikkema's treating physicians, ultimately concluded that Ms. Sikkema's "subjective symptoms of pain were high," and "minimal objective findings" in the medical records "did not match the reported symptoms." (*Id.* at PageID.290.)

Liberty's denial then concluded per Dr. Graham's record review, "no objective findings" existed "that would preclude [Ms. Sikkema] from working 8 hours per day, 40 hours per week." (*Id.* at PageID.290.) This report rejected the assessments and diagnostics provided by Ms. Sikkema's treating physicians. Liberty advised Ms. Sikkema of her right under ERISA to "request a review of this denial" in writing from Liberty.

4

\* \* \* \* \*

Keeping in mind that Liberty's initial denial was September 9, 2014, the Court wishes to digress and briefly call attention to another case at that time working its way through the federal courts. On September 4, 2015, the Sixth Circuit issued its opinion in *James v. Liberty Life Assurance Co. of Boston*, 582 F. App'x 581 (6th Cir. 2014). That case involved the same defendant, where Liberty had unsuccessfully sought to defend coverage denials on the theory that only "objective" evidence of disability should be considered. The U.S. District Court for the Western District of Michigan noted that Liberty's policy in that case, which is nearly identical to the policy in this case, did not require "objective evidence" as a matter of proof. The Sixth Circuit Court of Appeals affirmed the trial court, and in its opinion, observed, "[c]omplaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient." *Id.* at 589. And in that case, like here as the Court will show, the Sixth Circuit remarked: "Even so, we again emphasize that the majority of the physicians were able to tie James's complaints of pain to specific injuries . . . ." *Id.* at 589 n.2.

The timing of the opinion, however, apparently did not alter Liberty's approach to this case. While it solicited a new doctor, Liberty's appeal decision repeated the same errors.

\* \* \* \* \*

After Ms. Sikkema's administrative appeal was filed, Liberty decided to solicit a new "peer review" of Ms. Sikkema's physical condition from MES Solutions, which MES assigned to Mark V. Reecer, M.D., board-certified in physical medicine and rehabilitation.

Similar to Dr. Graham, Dr. Reecer never examined Ms. Sikkema, and based his opinions exclusively on his review of the paper records of Ms. Sikkema's medical treatment.

5

Based on his record review and on the nature of the "spinal fusion" that Ms. Sikkema underwent as a teenager, Dr. Reecer concluded that the only "functional limits" needed to be imposed on her were "no impact sports" and "reaching below the waist level/bending should be limited to occasional." (ECF No. 10-1 at PageID.81.) He concluded that "subjective symptoms are high," "[o]bjective findings on exam, PT notes, and diagnostics are minimal," and "[while Ms. Sikkema] does have significant scoliosis and underwent fusion," the fusion "appears to be stable." (*Id*.)

On April 6, 2015, Liberty advised it was "unable to alter our original determination to deny [Ms. Sikkema] benefits." (ECF No. 10-1 at PageID.66.) The appeal evaluation only cited to Dr. Reecer's findings, and concluded:

> In summary, we do understand that she may have been experiencing some symptoms associated with her conditions as of and following her claim date of disability. However, the available information does not contain exam findings, diagnostic test results, or other forms of objective medical evidence substantiating that her symptoms were of such severity, frequency, and duration that they resulted in restrictions and limitations rendering her continually unable to perform the duties of her occupation throughout and beyond the Farmers group, Inc.'s policy Elimination Period.

(ECF No. 10-1 at PageID.70.)

> According to Liberty's policy,
>
> [d]isabled means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of h[er] occupation on an Active Employment basis because of an Injury or Sickness; and . . . [a]fter 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of h[er] own or any other occupation for which [s]he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity.

6

(ECF No. 10-1 at PageID.66.)

## I. STANDARD OF REVIEW

In deciding a claim under 29 U.S.C. § 1332(a)(1)(B), the courts review the plan administrator or fiduciary's decision to deny benefits under one of two standards. *De novo* review is the default. It applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan does grant sufficient discretionary authority, the decision is reviewed under the more deferential "arbitrary and capricious" standard. *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996). Here, the parties agree *de novo* review is appropriate.

## II. DISCUSSION

The question for this court is whether Liberty correctly determined that Ms. Sikkema was not "disabled" as that term is defined by the The Farmer Group, Inc.'s Long Term Disability Policy—that is, that she was "unable to perform all of the material and substantial duties of h[er] occupation on an Active Employment Basis because of an Injury or Sickness." (ECF No. 10-1 at PageID.66.) *See Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990) ("When a court reviews a decision de novo, it simply decides whether or not it agrees with the decision under review.").

Respectfully, on a *de novo* review, this case does not even present a close call.[1]

---

[1] In fact, Liberty's decisions here may not have even survived "arbitrary and capricious" review.

Ms. Sikkema is entitled to her benefits because the medical record and her treating physicians' opinions clearly establish she was, by the Plan's own language, "disabled" and entitled to at least two years of coverage. Liberty's decision was erroneous in several respects.

To recap the evidence, Ms. Sikkema began suffering severe pain in the middle of 2013, which ultimately became unmanageable by early 2014. There are no genuine disputes—even among Liberty's doctors—that Ms. Sikkema's treating physicians accurately diagnosed Ms. Sikkema's conditions.

Dr. Aziz characterized Ms. Sikkema's diagnoses as follows:

Scollosis post open fixation with placement of two Harrington rods;
Thoracogenic scollosis;
Lumbosacral spondylosis as L3-L4 and L4-L5 with myelopathy;
Osteoarthritis
Sacriolitis
Facet arthritis of lumbar region;
Thoracic myositis;
Costovertebral degenerative changes at T5, T6, and T10;
Lumbar facet arthorapathy at L3-L4 bilaterally;
Sacroillac joint dysfunction;
Lumbar degenerative disc disease;
Fibromyalgia
Ankylosing spondylosis;
Chronic pain syndrome;
Lumbar post laminectomy pain syndrome;
Trochanteric bursitis;
Cephalgia;
Rheumatoid factor serologic test positive.

(ECF No. 10-2 at PageID.117.)

8

Both Dr. Graham's report and Dr. Reecer's report, which Liberty relied upon for its determinations, conclude the impossible—nothing "preclude[s] [Ms. Sikkema] from working 8 hours per day, 40 hours per week" (*e.g.*, ECF No. 10-1 at PageID.69)—and lack credibility.

First, the reports—and Liberty's decisions—erroneously cast Ms. Sikkema's claim aside for a lack of "objective" evidence to support Ms. Sikkema's pain levels.

Liberty's own policy in this case does not require a finding of disability to be supported exclusively by "objective" evidence. The Sixth Circuit Court of Appeals has criticized Liberty's treatment of "subjective" evidence in a similar case, remarking that "[c]omplaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient." *James*, 582 F. App'x at 581. Liberty's final denial letter acknowledged that Ms. Sikkema "may have been experiencing some symptoms associated with her conditions as of and following her claim date of disability," but Liberty denied benefits *because* "the available information does not contain exam findings, diagnostic test results, or other forms of *objective medical evidence* substantiating . . . her symptoms." (ECF No. 10-1 at PageID.70 (emphasis added).) "[I]t [is] inappropriate for an administrator to dismiss a claimant's self-reports and other subjective evidence of disability, particularly where the administrator has no basis for believing the evidence is unreliable." *James*, 582 F. App'x at 589 (citing *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009)).

Of course, Ms. Sikkema's providers were much better situated to evaluate her reported pain—and the "subjective" evidence—in this case.

> While there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir.2005), "[w]hether a doctor has

9

> physically examined the claimant is indeed one factor that we may consider" in determining whether a claimant is entitled to benefits under a plan. *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston,* 419 F.3d 501, 508 (6th Cir.2005). Therefore, while we cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician," *Nord,* 538 U.S. at 834, 123 S.Ct. 1965, we can ourselves consider the administrator's reliance on file reviews. *Calvert,* 409 F.3d at 295; *see also Smith v. Bayer Corp. Long Term Disability Plan,* 444 F.Supp.2d 856, 873-74 (E.D.Tenn.2006), *aff'd in part, vacated in part,* 275 Fed.Appx. 495 (6th Cir.2008) (attaching little significance to file reviews in the context of psychiatric evaluations because the specialty is dependent upon interviewing and spending time with patients).

James, 582 F. App'x at 586-87. The Court notes that the fact that Drs. Graham and Reecer never evaluated Ms. Sikkema is *a* factor in this case, and their reports are deserving of relatively less weight because "subjective" reports of pain were verified by Ms. Sikkema's treating physicians during physical examinations. (*See, e.g.,* ECF No. 10-4 at PageID.371 (treating physician noting that "Gaenslen's test" and "FABER test" both confirm pain).)

Putting aside Liberty's dogged reliance on lack of "objective" evidence, Drs. Graham and Reecer were, quite simply, wrong. The record reflects objective evidence to support Ms. Sikkema's diagnoses and corresponding pain. The Graham and Reecer reports, in the context of the entire medical record, were utterly unconvincing, and misrepresented the medical record in material respects. *See Frost v. Liberty Life Assurance Co.,* No. 13-1188, slip op. at 12-13 (W.D. Mich. Dec. 5, 2014) ("Accordingly, whether reliance on a reviewing doctor's opinion is acceptable depends on the quality of the review done by the independent doctor; it is not automatically given less credence than a treating doctor."). That is, contrary to the conclusory statements in the Graham and Reecer reports, *objective* evidence supports Ms. Sikkema's self-reports of disabling pain (and disability per the plan terms).

"Objective" tests documented positive findings to support Ms. Sikkema's disabling pain: "the hook at the upper end of the right Harrington rod appear[ed] to have become dislodged from [Ms. Sikkema's] spine" (ECF No. 10-4 at PageID.366); "mild degenerative changes of the sacroiliac joints" and of "the facet joints at the lower three levels" (*id.* at PageID.383); "narrowing of the left hip joint space" (*id.* at PageID.393); "minimal bulging of the intervertebral disc" (*id.* at PageID.395); "increased uptake at disc levels T4-T5, T7-T8, T8-T9, and T9-T10" (*id.* at PageID.401); "[m]ild increased radiotracer activity" at T5, T6, T10, and L3-L4, bilaterally (*id.*); and "intense . . . bilateral sacroiliac joint activity." (*Id.*) Of course, further positive observations could have been observed absent the amount of obstructive metal pieces remaining in and around Ms. Sikkema's spine. (*E.g., id.* at PageID.403.) Liberty and its reviewers had all of these findings available for review.

Each of these exam results, in fact, support Ms. Sikkema's diagnoses and pain complaints. And no exam results were meaningfully addressed by Drs. Graham or Reecer or cited by Liberty.[2]

To take just one small portion of the medical record: In July 2013, Ms. Sikkema had an x-ray because she "present[ed] with severe back pain." According to the radiologist, "[t]he t-spine film showed that the hook at the upper end of the right Harrington rod appears to be dislodged from the spine." (ECF No. 10-5 at PageID.495.) Ms. Sikkema was admitted twice to the Emergency Room for severe pain shortly thereafter. Ms. Sikkema consistently rated her pain "as a 10 on a scale of 0 to 10," and she "describ[ed] this pain as aching, throbbing,

---

[2] In fact, Dr. Reecer says that "no objective findings" existed, while Dr. Reecer concluded that "minimal objective findings" existed. These conclusions are patently inconsistent with the record.

11

sharp, . . . shooting, and stabbing and is constantly preset and is equally painful throughout the day." (*Id.* at PageID.498.) And the reports concluded she had, for example, "3-4 compressed discs in her back as well as osteoarthritis," along with possible "fibromyalgia." (*Id.* at PageID.497.) She was taking narcotics and receiving pain injections regularly.

Drs. Aziz and Rahimi both note that Ms. Sikkema was consistently "prescribed the highest dose of morphine for a non-malignant medical condition, i.e. cancer." (ECF No. 10-2 at PageID.117; ECF No. 10-5 at PageID.480 ("This is the highest dose of morphine that I am comfortable to prescribe[] for her non-malignant chronic pain.").)

If carefully reviewing the entire medical record, how one could conclude that Ms. Sikkema could work full-time, and successfully navigate every life activity with the exception of "impact sports" is beyond comprehension. Liberty chose to adopt the opinion of the document reviewers without so much as citing to Ms. Sikkema's medical record or a single note of her treating physicians.

And a final note to Liberty's criticism that "objective evidence" did not exist. Some evidence *could not exist* because some of the tests, particularly MRIs, were "not conclusive as there [wa]s too much metal in [Ms. Sikkema's] body." (ECF No. 10-5 at PageID.496.) In other words, one of Ms. Sikkema's underlying conditions—scoliosis (with "dislodged" Harrington rods)—made certain "objective" confirmations impossible.

Ms. Sikkema's treating physicians, who extensively documented her various conditions, and obtained both subjective and objective evidence, concluded Ms. Sikkema "is unable to perform the material and substantial duties of her own occupation as a Customer Service Advocate." (ECF No. 10-2 at PageID.117.) The Court, on *de novo* review, agrees.

The reports of Drs. Reecer and Graham contain inaccurate assertions and are not credible in this case; Liberty relied exclusively on those reports for its denial,[3] and the medical record, when viewed in its entirety, supports the conclusion that Ms. Sikkema was "disabled."

The Court cannot say with certainty that Ms. Sikkema has not exaggerated her pain at times. (*See, e.g.*, ECF No. 10-1 at PageID.80 ("The relatively benign exam does not match with the 9/10 pain rating at that visit (which is near to warranting immediate ER visit.").) However, the Court can say that, in this case, the treating physicians' conclusion that a maximum dose of morphine was medically necessary because Ms. Sikkema was suffering truly disabling pain much more closely reflects reality than the document-reviewing physicians' conclusion that Ms. Sikkema could do everything besides play tackle football.

## IV. REMEDIES

Ms. Sikkema brought this case pursuant to 29 U.S.C. § 1132(a)(1)(B), which allows civil actions "to recover benefits due" under a qualifying plan. *Id.*

Liberty's argument that there has never been any administrative investigation or determination as to whether Ms. Sikkema's medical conditions would enable her to meet the "any occupation" standard for disability is well-taken. The record needs to be further developed as to whether Ms. Sikkema is entitled to benefits going forward. Accordingly, this action will be remanded in part, to the extent that Ms. Sikkema has invited the Court to prospectively award benefits under the "any occupation" definition of disability. Remand is

---

[3] Liberty argues it did not rely exclusively upon these reports because of some conclusory language in the denial letters. However, because the letters fail to acknowledge or cite to a single opinion or record by Ms. Sikkema's treating physicians, the Court can only conclude the language was perfunctory—and probably part of the "stock" language contained in every denial letter.

13

consistent with the approach taken by other courts in similar circumstances. *See, e.g., James*, 984 F. Supp. 2d 730 (W.D. Mich. Oct. 23, 2013), *aff'd*, 582 F. App'x at 581 (benefits awarded through "own occupation" period, and claim remanded for determination under "any occupation" standard and for determination of applicability of mental illness cap).

However, since the Court finds that the record reflects sufficient objective (and subjective) evidence to support Ms. Sikkema's disability, and Liberty did not cite to the "non-verifiable symptoms" provision during denial, remand is not appropriate for that purpose. Ms. Sikkema is entitled to full benefits allowed by the policy for the two-year period.

Finally, Ms. Sikkema asks the court to award prejudgment interest. "Although ERISA does not mandate the award of prejudgment interest to prevailing plan participants," the Sixth Circuit has "long recognized that the district court may do so at its discretion in accordance with general equitable principles." *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998). This is an appropriate case for the award of pre-judgment interest. Since 2014, Liberty has enjoyed the use of funds rightfully owed to Ms. Sikkema under the Plan. Prejudgment interest would compensate Ms. Sikkema for the lost time-value of these funds.

The Court will order reinstatement, but it cannot yet determine the full amount owed or the proper interest rate to be used in calculating prejudgment interest, as the parties have not yet submitted evidence on these points. The Court will therefore give the parties an opportunity to address these questions. Liberty will have 14 days from entry of this opinion and order to submit a brief containing: (i) an accounting of the monthly benefits payable to Ms. Sikkema since February 5, 2014; (ii) a proposed rate or rates for prejudgment interest; and (iii) a calculation of prejudgment interest. Ms. Sikkema will then be given 14 days to

respond. To the extent the parties cannot agree on these issues, the Court will resolve the disputes and enter an appropriate judgment, though the Court would appreciate agreement.

## ORDER

For the reasons discussed herein,

**IT IS ORDERED** that Defendant's motion for entry of judgment (ECF No. 13) is **DENIED**, and Plaintiff's motion for entry of judgment (captioned as a "brief") (ECF No. 12) is **GRANTED IN PART AND REMANDED IN PART**. Defendant shall award Ms. Sikkema full benefits under the "own occupation" definition of the policy, retroactive to February 5, 2014. Defendant shall have the opportunity, however, to reevaluate whether Ms. Sikkema is entitled to benefits under the "any occupation" disability standard going forward.

**IT IS FURTHER ORDERED** that no later than 14 days after entry of this order, Defendants shall submit a brief containing (i) an accounting of the monthly benefits payable to Plaintiff since February 5, 2014, (ii) a proposed rate or rates for prejudgment interest, and (iii) a calculation of prejudgment interest. Plaintiff may file a responsive brief no later than 14 days after the filing of Defendants' brief. A stipulation may be filed in lieu of briefs.

The Court will entertain a separate motion for attorney fees, with an attached bill of costs, filed no later than 14 days after the entry of judgment. Likewise, Defendant will have 14 days to respond. A stipulation may be filed in lieu of a motion.

**IT IS SO ORDERED.**

Date:   September 6, 2016             /s/ Paul L. Maloney
                                      Paul L. Maloney
                                      United States District Judge